## W. H. LANKSTER v. THE STATE.

No. 2007. Decided March 21, 1900.

**1. Murder—Accidental Killing of Third Party—Charge.**

On a trial for murder, where there was evidence to the effect that when the parties met a quarrel ensued between defendant and one S., who was riding in a wagon with R., the deceased, and during the quarrel S. drew a pistol and snapped it at defendant, whereupon defendant fired both barrels of his gun, wounding S. and killing R., who had nothing to do with the difficulty, Held, the charge of the court was erroneous which in effect instructed the jury that if one preparing to defend himself from an attack by one party accidentally kills a third party, his said preparation not apparently endangering the life of said third party, he would be excusable. This is a misstatement of the law which gives a party the right to prepare to defend himself against an attack, even if such act of preparation actually endangers the life of an innocent party.

**2. Same—Self-Defense—Threats—Charge.**

On a trial for murder, a charge of court which limited defendant's right of self-defense in case he was endeavoring to carry out threats which he had made, is erroneous where there was no evidence that defendant had made any threats against either of the parties involved in the transaction.

APPEAL from the District Court of Houston. Tried below before Hon. A. D. LIPSCOMB.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The indictment charged appellant with the murder of one Jones Reinhardt, on June 26, 1899, by shooting him with a gun. The opinion below states all the important facts attendant upon the homicide. The main questions discussed on this appeal relate to errors in the charge of the court upon excusable homicide by accident and self-defense, which portions of the charge are set out in the opinion.

*Wm. Watson, Moore & Newman,* and *Adams & Adams,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years, and he appeals.

In order to properly discuss the criticisms of the court's charge, we will make a substantial statement of the immediate facts attending the killing. The witness Stringer was a witness in a lawsuit between the defendant and deceased in regard to a cattle transaction. After the decision of that case, defendant went to his store, some nine or ten miles west of Crockett. Later on, witness and deceased, in a wagon, went in the same direction, and, when about seven or eight miles from Crockett, met defendant returning from the store, in the direction of Crockett. Stringer says: "I was the first to speak, and remarked to him, and asked 'if we had had enough rain to do any good,' and sorter checked my horses, and Lankster stopped. It had been sprink-

ling rain on us nearly an hour. He said, 'No, not enough to do any good.' He was on the north side of us, to my right. He remarked, when he said we had not had enough rain to do any good, 'Ed, you swore a lie to-day in that case.' I said, 'What about, Lankster? I do not think so.' He said, 'You swore that I was to deliver Reinhardt fifty cows.' I said, 'Mr Reinhardt swore the same thing, Mr. Hughes swore the same thing, and the contract was the same thing, and, if I swore a lie, the whole business was a lie.' He just remarked it was a damn lie. I said: 'Mr. Lankster, I never have taken a damn lie off of any man. You are armed, and I am not; and all I ask of you is to give me a chance.' He got off his horse, and cocked his gun, and said, 'Damn you, I will give you a chance,' and came towards the wagon, at the same time raising his gun to his shoulder. When he raised his gun, I started to say, 'Mr. Lankster, for God's sake, don't shoot me.' I saw him raise his gun. I just dodged over on the front end gate of the wagon. Lankster fired, and about as quick as a man could, he fired again the second time,—about as quick as a man could shoot both barrels of a gun and not shoot them both at the same time. I started up and jumped out of the wagon on the left-hand side. Reinhardt was lying on the ground on the left-hand side of the wagon, dead, with his face downward, with his feet kind of drawn up. He never moved. He gurgled or moaned twice. I was wounded in the right shoulder. It was across the lower part of the shoulder blade, ranging across my back." This witness further stated, in substance, that defendant undertook to shoot him with a pistol, but it failed to fire. Defendant did not say a word to deceased during the conversation. All the conversation was had between defendant and the witness Stringer. The witness denied having a pistol, and also stated that deceased had no pistol. Witness further denied that defendant said, just before he shot, "Get out of the way, Mr. Reinhardt." Defendant testified to the fact that he had gone to the store; was returning, when he met the witness Stringer and the deceased, Reinhardt; and further says: "When I rode up, they were in the road, and I turned out of the road to pass by. Stringer pulled his team up, and I stopped my horse. He asked me if we had had enough rain. I think I told him; 'Not enough to do any good.' Then he spoke up, and said, 'We beat you in that case to-day,' and I remarked that, 'if you did, it was by you swearing a lie,' and he said, 'I didn't swear a lie.' I said, 'You did.' And he said, 'I won't take it,' and handed the lines to Reinhardt, and Reinhardt took the lines. Stringer reached down in the wagon, and picked up a pistol, and when he did he raised, and commenced by snapping the pistol at me; and when he did I pulled back, and hallooed to Reinhardt to get out of the way. As soon as I hallooed to Reinhardt, I jumped off my horse. I told him to get out of the way, because I saw Stringer was going to shoot me. I jumped off the horse. That threw me between the horse and wagon like; and the right hand barrel was already pulled back, and I commenced pulling back the

left-hand barrel. When I jumped off, I took the gun in my left hand, and that threw the stock of my gun under my left shoulder, and I must have had my finger on the right-hand trigger of the gun, and it went off; and when I done it I must have let the left-hand hammer slip. It didn't take a minute. The horse was betwixt me and the wagon. The horse wheeled out of the way, and the gun went off. If he had stood still, then both loads would have gone into the horse. It was like a long report. It was almost at once. I just throwed up my head to see, and Stringer was bent in towards the end gate of the wagon. He then fell out over the left-hand side of the wagon. He was on the other side of the wagon, and I commenced hallooing, and walked over to the back of the wagon, and as I got around to the back of the wagon he hallooed to me not to shoot any more. He said, 'I believe you have killed me.' And I said, 'No, Mr. Stringer, I would not shoot any more.' I would not shoot him, and turned and walked right back to my horse, which was some twenty-five or thirty steps away. * * * I had no pistol at the time. I had owned a pistol. The pistol of Stringer's was lying right at the hind wheel of the wagon. When Stringer was going over the fence, I think he had the pistol in his hand. Neither of the shots were intended for Reinhardt. I had nothing against Reinhardt. We had always been good friends, and he was a mighty nice man. Nothing betwixt us but this lawsuit."

Charging in regard to excusable homicide by accident, the court, among other things, instructed the jury: "So, if a man prepares to defend himself, and in that preparation accidentally discharges his gun, and thereby kills another, in that case, if the act of preparation was not such as apparently endangered the life of the other or others, then the accidental death of another arising therefrom is excused, whether the deceased be the one against whom the person killing was preparing to defend himself, or whether the person killed be an inno-cent third party." This charge is hinged upon a misstatement of the law. Where a party prepares to defend himself against the attack of another, it makes no difference if the act of preparation either appar-ently or actually endanger the life of another or others. He has the right to so prepare himself, and to act in his own self-defense, whether it endangers other people or not. This charge was clearly wrong, and hinges defendant's theory of accidental shooting upon a misstatement of the law.

Again, the court charged the jury in regard to self-defense: "And, if the slayer had previously threatened to take the life of deceased, he would not be deprived of his right to kill in defense of his life or per-son, unless, before any appearance of danger to himself from the per-son threatened, he has manifested an intent to carry out the threat. And the right of self-defense is not impaired by mere preparation for conflict, unaccompanied by any act of hostility on the part of the per-son so prepared." Applied to the facts of this case, this charge is also erroneous. There is no evidence in this record of threats by defendant

against Reinhardt or Stringer. If defendant, in seeking to shoot Stringer, shot and killed Reinhardt, he would be guilty of murder in the second degree, under the State's theory. If, under his own theory, he shot at Stringer and killed Reinhardt, he would be guilty of no offense, because under his testimony, Stringer had twice snapped his pistol at him, before defendant fired at all. Of course, if he shot at Reinhardt, and not in self-defense, for the purpose of killing, he might be guilty of murder in the first or second degree. But from no standpoint is there any threat proven as having been made by appellant against either Stringer or Reinhardt.

The charge on manslaughter is also criticised. While, perhaps, this charge is not correct, and, to say the least of it, is very loosely drawn, we would not be called upon to reverse, because, as we understand the record, the issue of manslaughter is not presented by the facts. The issues under the testimony were sharply drawn,—murder in the first or second degree, from the State's evidence, and from defendant's, clearly self-defense, or accidental killing, as the jury might believe.

There are other reversible errors in the record, but we believe they will hardly occur upon another trial, and, if they should, it would likely be presented in the record differently. For this reason the application to change venue and motion for continuance are not discussed. The application for continuance, if necessary upon the subsequent trial, may be entirely different from that presented in this record, and so may be the facts in regard to the change of venue. Were it necessary to go into the question, we believe this judgment should be reversed because the verdict was arrived at by lot. But this error is not likely to occur upon another trial. For the reasons indicated, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

BROOKS, Judge, absent.